Thank you, your honor. May it please the court, my name is Richard Hill and I represent Greater Richmond Transit Company in this case. This case is about whether or not GRTC, a private company, can decline to accept political advertising on its buses and whether those decisions regarding advertising constitutes state action for purpose of 42 U.S.C. 1983. As this court is aware, private companies such as GRTC are only subject to constitutional constraints through enforcement under 1983 in very limited circumstances and as this court stated in allegedly unconstitutional conduct is fairly attributable to the state, begins by identifying the specific conduct of which the plaintiff complains. And this is obviously a very factual specific inquiry, but this court has reinforced that premise numerous times, including as most recently as the Pelletier v. Charter Day School case, which was decided just last month. But as most applicable here, the Phillips v. Pitt County Memorial Hospital and Moore v. Williamsburg Regional Hospital cases discuss this particular inquiry. So the inquiry in this case is, is the GRTC's decisions with respect to advertising, are those decisions government action under 1983? And our position as we've set forth in our briefs and previously is, is that they are not. The decisions are made by GRTC employees and in some cases in consultation with the advertising, the outside advertising agency. There is undisputed evidence in this case that none of those decisions are influenced by or directed by any state actor or even by GRTC's board. They are independently made and so GRTC's decision in this particular case to not run the plaintiff white coat wastes ad was not state action and therefore is not subject to 1983 and that by itself is a sufficient ground to dispose of this appeal, which is the principal issue or the number one issue that GRTC has raised. The second issue, before you go to the second issue, I wanted to give you a chance to talk, but can you talk to me for a minute about LeBron and I take, well maybe tell me why you think LeBron doesn't control here, particularly considering, you know, the facts of LeBron itself. Well, our position is, as we've explained and I think that this court has indicated, although this court has never had a decision in LeBron specifically related to a transit company or one that's structured quite similar to ours, but our position is that LeBron essentially requires several things in order for the test articulated to apply. The first is that the corporation has to be created or the entity has to be created by special law and that was really critical in LeBron and as we set forth in our brief, our reply brief, the Congress in enacting the legislation set forth very lengthy oversight and discussion and rules about how this corporation was going to be set up, what it would do, the powers that it would have, how it would be financed, how its board would be composed, and that all those decisions were taken in an act of Congress. In this particular case, GRTC was created under Virginia's general corporation statute and it was created, you know, it was created by the Richmond city attorney to create a company that, the company itself was created under Virginia law and there's no specific either state or local or any law. So let me break that piece down just a little bit, right? So in was created under D.C. corporate law, right? So it was created under D.C. corporate law and it had sort of specific restrictions that were an act of Congress but the act of Congress just authorized its creation and it was created under D.C. corporate law and here we've got Virginia law. Now the only distinction between those that I can see is that, you know, the Congress added these sort of special provisions for Amtrak that were different from D.C. corporate law and obviously Richmond didn't do that because Richmond has no power to control Virginia corporate law and doesn't have the authority to change what Virginia corporate law permits. Is that the distinction that you're drawing? Your Honor, a municipality could never satisfy LeBron because it can't change generally applicable corporate law? I think that would certainly be my position with respect to an entity created in Virginia. I mean, you know, based on the Dillon rule and based on the unique powers that they have, only the state of, only the commonwealth could create or legislation of general special legislation in this case that would have the effect of creating a corporation. What was created under the D.C. law in the case, the difference is under LeBron, what was created under the D.C. law was essentially the corporate form whereas all everything else about the corporation was created by the special legislation and in this case neither of those two things occurred. I mean, the corporation was enacted under state law and all of the corporate particulars are set forth in the general corporation documents but more importantly, Your Honor, and as I think is applicable specifically here, what happened with GRTC is essentially indistinguishable with what happened in the Phillips versus Pitt North Carolina, I believe I'm right about that, North Carolina state statute that authorized localities to create business, to create corporations and create hospital corporations in that particular instance and so by virtue of that law, the locality created a corporation under the general corporate statute of North Carolina. Right, but there the court just says, the court doesn't actually hold that, right, the court just says there's a failure of proof, right, they had the burden to show it was created by special law and they failed to make an allegation, right, that's the holding, right, they just flat failed to make an allegation, so that's the holding. Now, there's subsequent discussion that says, you know, maybe, we don't know, but maybe this was done at, they say, the instance, presumably at the instance of Pitt County, right, but the point of that is, is that they don't know because there was no allegation, right, so I don't understand how that helps us at all here because there are allegations here, right? Well, I mean, I think, I think if you, if you look at the particulars of the legal, uh, the legal particulars in, behind the, the situation in, in the Phillips case, I think it does give us the, the necessary information and background and the court, the court assumes essentially what did occur, which is that it was created by the locality or at the instance of the locality, I believe, is the word that's used in the opinion and that's sort of what, what, what we have. Presumably, right, because it's already held in the previous Senate, two previous sentences, that there's no allegation. This is a failure of allegation and then it comes back and says, we can presume that this is how it happened, but the point is we're having to make presumptions here because there's a fundamental failure of allegation, which isn't surprising because there's only one reference to LeBron in any of the briefing, right? That's why they didn't make any allegations about it because that wasn't the honor. I mean, I think the language that's stated in that opinion, and again, I, I, I don't disagree with you that it's, that it, it, it seems like it's an issue that comes up sort of late in the decision, but the, the court, this court says very clearly that it is plain enough that PCMHI was not created by special law, um, rather, and then it says it was created in 1953 and then the presumably part, right, under the general non-profit incorporation statutes in North Carolina, and then in 1998, PCMHI filed restated articles in order to receive, uh, the conveyance of the hospital from the, from the county. So the, the court, this court looked at that issue and, and made, and made the, the, the finding in that case that it, it was, it was plain that PCMHI was not created by special law. And the mechanism there is the same, right? The point of that is, is that follows them saying they point to no allegation in the complaint, right? And so then they make some assumptions about what might be the case and reject those. But it seems to me, and I don't want to belabor the point, but what I'm having trouble seeing is, is how the holding there is, is, is controlling on us here. I know you make that argument in your brief. I'm just having a hard time seeing that. Well, I mean, I, I, I, the reason that I'm, the reason I think it's finding, or at least the reason I think that it governs this case is, is as I indicated, you know, and I can't, I don't want to belabor the point and just simply restate what, what we argued in the brief. But the point is simply that the mechanism, the critical, the critical issue is the mechanism by which it occurred is almost identical to the mechanism under which we're there's a general power conveyed by the state, a general power. In this case, the general power that was conveyed was that the power of Richmond to take certain acts in furtherance of its transportation, one of which could have been setting up a corporation under state law. And there is a, and that's, that's the extent of what's done. And then the localities take the LeBron. That's the reason why LeBron, in our opinion, doesn't apply to this case, because it doesn't satisfy the special law portion of the test. We would argue further that it doesn't apply, that it doesn't satisfy the control test, primarily because even though we concede that the, the county, that the, the, all the stock is owned by, by government, that in and of itself is not enough, that there has to be specific control over what's at issue. And the thread through all of these cases that I just cited, culminating most recently in the Peltier cases is that, is that the decision that's being made has to be done as a government action. So, so that, so the additional control part of the test requires that there be some evidence or that there be some showing that the, the actual challenged action is, is in fact an action of the government. And that doesn't exist in this case. And I would note that in, in Peltier, this court specifically reserved the idea that there might be circumstances under which the schools that were issued there could be subject to 1983. But in this particular case, in the Peltier case, that decision, which had to do with the dress code and the implementation of that, was not, because it was not, there, there's no evidence that, that, that the state or that governmental actors influenced and controlled that, which is, which is essentially the, the, the situation that we have in this case. So. Although in Peltier, there's no suggestion that the state owned the stock of the charter school or that the state appointed every board member. That's, that's true. I agree. Which is what, which is, which is what LeBron tells us is like the relevant inquiry, right? But, but in Peltier, the, the, the, the government, the government had indicated that it is a, that the schools were deemed to be public. These, these were created by a statute under North Carolina law, or authorized by a statute. And they, there was, you know, there were many of the other factors that would, I could say, yes, I agree though, that, that there, there's no evidence or allegation there that any of the board members were appointed by state. However, I would note that in, in, in the Pitt County case, and also the Williamsburg case, the hospital cases, in both of those cases, there was extensive government control, government involvement in appointing the, the members. And in fact, in one of them, and I believe it was the Williamsburg case, although I may be conflating them, the, there were, there were governmental officials who served as ex officios on the board. And that still wasn't good enough to constitute sufficient level of government control under the circumstances. And in this case, there's no evidence or allegation that the GRTC board members are anything other than, you know, private citizens who are appointed by the shareholders. And in this case, the shareholders are governmental entities. And that's another thing that's critical in this case is that under, under Virginia law, the Virginia Supreme Court, as we pointed, as we point out, has ruled that, and I mean, it's not, it's not particularly surprising, but under Virginia law, you know, the, a corporation is not, the shareholders are not automatically deemed to be the corporation and vice versa. So the fact that government owns the shares does not automatically transfer the, everything that the government, that the corporation does or the corporation itself into the government or make it an alter ego of the governmental form. So I hope I've, I've tried to answer those, those particular concerns on this. It looks like I'm reserve, I've reserved some time and I hope I could have an opportunity during that time to respond to the main crux of Mr. Strugar's argument, which, which is essentially the first amendment component of the case. But, you know, it's our position that, that the, that GRTC does not satisfy the test for state action under 1983, even if you, even if LeBron applies, which we suggested does not. So on that, I will turn it over to Mr. Strugar. Thank you, Mr. Hill. Mr. Strugar. Yeah, please, the court, Matthew Strugar for the White Coat Waste Project. This case asks whether an entity created, owned, and controlled by government can enact a speech restriction with rules so lacking in criteria that the exact same speech can either be permitted or based on the speaker's identity. And the appeal raises three issues, only one of which we've talked about so far. First, obviously, is whether GRTC is a state actor. We say yes, the district court said yes. GRTC obviously says no. Then the other two questions are whether GRTC violated White Coat Waste's first and 14th amendment rights by refusing to run White Coat's ad. The district court said yes, we say yes, GRTC obviously says no. And the third question is whether GRTC's advertising prohibition on political advertising is facially unconstitutional. There, the district court said it is facially constitutional. That's GRTC's position. We say it's facially unconstitutional. As to state action, GRTC is a public transit operator created by the city of Richmond, controlled by Richmond and Chesterfield County, where city funds make up all of GRTC's operating shortfalls, where the city and counties approved GRTC's fares and its routes, and where government actors at all levels view and treat GRTC as if it is a state actor. If operated like any other municipal transit system, the only difference is it's incorporated. And the record shows there's only one reason it was ever incorporated, was to get around Virginia's state prohibition on recognizing public sector unions while still getting federal money that required recognition of those collective bargaining rights. The state essentially gave Richmond an exemption to the state prohibition by allowing GRTC to incorporate, and it worked. GRTC's employees remained unionized. The federal government, sorry, the Department of Transportation recognized GRTC as, quote, a public body, which was necessary for distributing federal funds. Now, the district court found GRTC was a state actor to test. We basis was pervasive entwinement, and the district court found that eight factors showed GRTC's entwinement with government actors. The city and county owns and always has owned all GRTC shares. The city and county appoints its entire board. GRTC uses public use license plates that are used for government-owned vehicles. GRTC is subject to the Virginia FOIA. GRTC is represented by the the city funds its perennial losses, and its creation was specifically authorized by the Virginia legislature. Judge Richardson, you know, talked a little bit about in LeBron how it was authorized by, how the creation of GRTC was authorized by Richmond, but it was actually authorized by both the state and the city. Because of the Dillon rule, the state had to give specific authorization to Richmond. It passed a law that did not apply to any other actor, did not apply to any other city. It was, I hesitate to use the word special, but it was specific to Richmond buying a public transportation system that was previously privatized and falling apart, and it gave Richmond that specific authority, which then Richmond took and created it. But returning to entwinement, that's pervasive entwinement under Supreme Court precedent. Brentwood, a private athletic association membership, was 84% public institutions, mostly funded by state actors, was pervasively entwined enough to the point to becoming a state actor itself. And Brentwood asked two questions that I think are relevant here. First, it says, given the entwinement, is there an offsetting reason to see the entity as private? There wasn't in Brentwood, and there's not here. Again, the sole reason for incorporation was to tap federal funds while getting around the prohibition on public sector unions, but that's not a reason to exempt it from the Constitution. There's no unfairness in finding state action here. The second question Brentwood asks is, how does government itself view and treat this entity? Do they view and treat it as part of government? And here, government actors at all levels view and treat GRTC as a state actor. It's represented by the city attorney's office. It's subject to the Virginia FOIA. It uses public use license plate for government-owned vehicles. The Federal Department of Transportation considers it a public body for federal transportation money. So because GRTC is even more intertwined with government actors than the athletic association in Brentwood, precedent compels finding GRTC as a state actor for the purposes of Section 1983. But on the alternative holding, the district court found that under LeBron, government-created and controlled corporations are the government for the purposes of state action. Here, it was created by government. The Virginia Assembly passed a law with a single purpose to give Richmond the power to incorporate the entity. Richmond then incorporated it. If government didn't create GRTC, no one did. And then it's controlled by government. It was enough in LeBron that government appointed all of Amtrak's board. That's what we have here. And while Amtrak at least had some common stock owned by private individuals that at one time had voting rights for the board, GRTC stock always is and always has been exclusively owned by Richmond and Chesterfield County. There's more control here than in LeBron. Brentwood summarized LeBron's holding by saying Amtrak was government for constitutional purposes regardless of its designation as private because it was organized under federal law to obtain government objectives and was directed and controlled by federal appointees. We have each of those elements organized under state and city law to obtain city objectives and directed and controlled by city and county appointees. As to just a couple of points on the authority that Mr. Hill is discussing, I think the easiest way to... I think Phillips is actually easier than Mr. Hill and your honors were wrestling with. In Phillips, the state was presumably incorporated by the locality or at the insistence of the locality, but that was in the 1950s. The difference in Phillips was that it was sold in 1998. So even if it was created by this law, the North Carolina Hospitals Act or whatever it was, perhaps it was a government-created and controlled corporation from the 1950s to 1998, but it was sold for $30 million to a private actor in a deal whose contract said the purpose was to make it a private entity. So after 1998, when the Phillips case came up, it was no longer sort of created. I mean, it might have been created at one time, but in its current form, it wasn't created by any special law. It was created by being sold, by being privatized. Now there's some question in this case about whether government actors had to come in and sort of direct GRTC to deny my client's ad. The case law doesn't require anything like that. In LeBron, there was no evidence or argument that government actors, federal actors came in and said, hey, reject this specific ad. It was enough that there was an advertising policy appointed by the board. And LeBron talks about Amtrak being a state actor sort of per se, and there's a dissent. It's an eight-to-one decision. Justice O'Connor's dissent says, hey, we should look at this act by act, not a per se rule that an entity is a state actor for all purposes. And that's GRTC's position here, but that got one vote in LeBron, and the eight votes went the other way, saying it was per se. I recognize that some of this court's decisions, including Peltier, sort of look act by act. But even in Peltier, the court looked to the board making the dress code policy, not the teacher sending the student home pursuant to the dress code policy. Here, GRTC asked for a rule that the government would have to compel the teacher to send the student home, instead of just enacting a policy that, or enforcing a policy that exists. Here, the GRTC's board, appointed entirely by the city of Richmond, enacted the advertising policy, and it was that policy that controlled here. If I can move on to the First Amendment argument, because GRTC is a government actor, it must comply with the Constitution. And we contend that it's both GRTC's political ad prohibition is facially unconstitutional for two reasons. It's incapable of reasoned application, and it's viewpoint discriminatory under the First Amendment. And for similar reasons, it also violates the 14th Amendment because it's vague. GRTC rejected my client's ad, criticizing experiments on dogs at the McGuire VA MC, pursuant to an arbitrary exercise of discretion. GRTC's, like the Minnesota Voters Alliance versus Mansky, GRTC's prohibition on for what can come in versus what stay out. And both Mansky and this case involve non-public forums with virtually identical prohibitions on so-called political speech. And the cases applying Mansky to political speech prohibitions and non-public forums, since post-Mansky, are unanimous. Except the case out of the Third Circuit, the suburban mobility case out of the Sixth Circuit, the Zuckerman and AFDI cases out of the D.C. Circuit, each struck down a prohibition on vaguely defined political speech in non-public forums, and they struck them down facial. And the record here is clear that there's no reasoned application. GRTC's ad allows in one ad opposing animal cruelty in the context of spaying and neutering and dog fighting, while censoring my client's ad in the context of animal experimentation. It'll run ads about the vice presidential debate, despite the obvious political nature of the case. I think the decision here was a suggestion that there was a political debate on an issue, and they don't want to take one side of the debate. And the ad that you have here is stop taxpayer-funded drug experiments. That's the ad. And Ms. Pace determined that it was put out by a political action group. And because that is controversial as to whether it takes a public position on stop taxpayer-funded ads, she concluded it was a political ad. It seems to me that's a lot closer than prevent cruelty to animals, which is sort of just a moral proposition that most people would support. I mean, if the ad on the side were to take any hot issue, and the ad was put on the side supporting one side of the hot issue, the school bus company could clearly say, it looks like we're sponsoring, at least we approved these ads, and it'll be attributable to us, and we don't want to get involved in that and distract from our neutral public service. So I'm not sure it's quite, and I'm not sure the Mansky case is quite analogous. It applied some of the same principles. But there, each person coming into the polling place would be speaking by reason of a t-shirt or a badge, and could say, it's just a whole range of things. And as you know, Justice Scalia came up with all different types of possibilities, what's included, what's not. But here we have an ad put on the side of a bus that's been pre-approved, and you have to pay for, and people would attribute it to the bus company. So I wonder why this isn't closer to the Lehman case. Sure. I think, well, let me Zuckerman and AFDI found that Lehman didn't control. And that adds on, I think, in each of those cases, arguably more controversial than my clients' cases, were still sort of so amorphous in what could stay in and stay out that they didn't survive. So as to Lehman, the first, if I could just pull it up, the first sentence in Lehman frames the issue as whether the bus agency had to accept paid political advertising on behalf of a candidate for public office. So you had a much more narrow and defined prohibition in Lehman than you did here. A speaker could know coming in whether it could stay in or stay out. But the prohibition was political advertising. The ad in that case happened to be promoting a particular candidate. But the question is, does a political ad, is it limited to a particular candidate? And I thought that the company here suggested, well, there are political issues, hot political issues. I mean, what if somebody came in and said, ban all abortions? And they put those on the buses throughout the city. You'd have people throwing eggs at it and drawing graffiti on it and distracted, and they would assume the city is taking a political position. And I think the city could say, well, that's a hot issue, that's debatable, and there's a political action group put it on. I think that was important to Ms. Pace's analysis as to whether there was a political action group behind it. But in this case, she concluded, number one, it was stop taxpayer-funded dog experiments, which is talking about spending taxpayer money and an issue on that. And the second thing she said, she checked to see if it was a political action group and found that it was, and thought that that is sufficiently controversial to constitute a political ad. I think under Layman, the question is whether that's arbitrary and unreasonable, and it's a hard case to make. I don't think so, I mean, I think that Ms. Pace's application of political ad prohibition shows some of its problems with her conception of what is a political action group or a political action individual. You can say that if you're making a facial argument, and that's a whole different standard. But if you're not making a facial argument, it seems to me you have to focus on the facts of this decision. Sure. Our cross appeal is the facial issue, so we're making that. I understand that. And, you know, Ms. Pace said, you know, support the troops could come in depending on who, you know, who is speaking. You know, whether they could run Nike's ad featuring Colin Kaepernick's face would require GRTC to research him and what his views are. Whether Walmart can advertise depends on what they say about them on their, about us. As in Mansky, whether an ad is prohibited or not turns entirely on the background knowledge and media consumption of the official applying the policy. As to, you know, the risks, GRTC would have to put up, you know, any kind of inflammatory advertisement. I think there's numerous ways to deal with the numerous limiting principles. There are, you know, GRTC prohibitions. Sure, that you can do better. The question is whether this one is defective. And I noticed that when you, when citizens designed their own vanity license plates and put them on license plates, the Supreme Court suggested that that was imputable because of the approval process to the state. And actually in that case, the Walker case, they called it a government speech and therefore wouldn't even implicate in the first amendment. This is clearly, that case said layman is not a government speech case, but it still is out that end of the spectrum where what's on the side of the bus is imputable to the city of Richmond and Chesterfield County. And they just don't want to get mixed up in controversies because transportation is supposed to be neutral for everybody. And if somebody's in on the bus and sees the ad they're inside or out, it could cause conflict, tension. Yeah. If I may respond just really quickly with a couple of points. First, there's nothing in the record suggesting that anybody would have, that they thought that anybody would have reacted adversely or violently to my client's ad in particular. And that might be a reason to keep inflammatory ads in general. There's many ways GRTC could address that problem. Well, taxpayer funded dog experiments. That sounds pretty controversial. I don't know who's doing taxpayer funded and there must be an issue on that, but it was a political action group's position. I understand your position. Maybe the simpler answer is a ban on controversial speech is viewpoint discriminatory and viewpoint discrimination is not allowed in non-public forms. There are numerous ways GRTC could keep out ads that would actually cause disruption. There are prohibitions that we have not challenged here, including ones that subject groups to scorn or ridicule, prohibitions against the advertising that promotes antisocial behavior. There might be others. Those kinds of ads could be screened out there. Other courts have found that as that there is an actual record that they are likely to cause violence, including ads about the Middle East and Israeli-Palestine conflict can be screened out. That's the Ninth Circuit and Seattle Mideast Awareness Campaign versus King County. They could deal with this the way most major cities deal with this, New York, LA, DC, in that they basically prohibit non-commercial advertising. Every advertising has to propose a commercial transaction that screens out a lot of the sort of ad criticism. If you look at the list that the city has here, they don't want political ads, but they also don't want religious ads. There's a list of 10 or 15 areas they don't want, and all saying just what you're suggesting. I mean, what they don't want is controversy on the public buses. Sure, but they allow in all kinds of non-commercial advertising, as we showed at that thing, sort of the Gracie's Guardian or even the Support Our Troops advertisement that they would allow if it was the federal government speaking, but not if it was a veterans' rights organization. Finally, they could close the forum entirely. I know that advertising brings in 1% of GRTC's revenue, but a government can always close the forum. Finally, it could meet strict scrutiny. That's essentially what the Ninth Circuit found about the Israel-Palestine ad in the Ninth Circuit was that they built a record that it was actually going to cause violence, and it was essentially a strict scrutiny decision. I see my time is up. Just in summary, GRTC's advertising prohibition does act as a prohibition against advertising that GRTC believes will be controversial, and any prohibition on controversial speech is inherently viewpoint discriminatory on its face. For that reason, we ask that the court affirm on state action and the as-applied rulings and reverse them to facial constitutionality. Thank you, Mr. Struger. Mr. Hill? Thank you, Your Honor, and I don't really have much to add to the colloquy that was just had there other than to just note that, as Judge Niemeyer has indicated, this case is governed by the Lehman case. Well, let me ask you about Lehman. You say it's governed by Lehman, but Lehman was very clear there. It says, and I'm quoting, there was uncontradicted testimony at the trial that during a whole 26 years of public operation, Shaker Heights System, pursuant to the City Council action, had not accepted or permitted any political or public issue advertising on its vehicles. That was a very driving fact of that case. As a matter of fact, the opening statements of the opinion itself talked about, that's the narrow question. That's not the facts here. You have to rise or fall on this record here, and you've got an extensive discovery record here. For example, that is, you are not only looking at what was to be written on the advertisement, you were trying to find out who was saying it. That's kind of the height of viewport discrimination, isn't it? Let's see, wait a minute, we see what their ad is, but let's see who the person is and what they think. Isn't it true that you go and look at their website to see whether or not they're going to pass muster, notwithstanding you've read the four corners of proposed ad? Is that correct? Your Honor, I think that there was testimony about that during the hypotheticals that were presented. They were not hypotheticals. These were actual instances where indicated they actually went on these websites and actually went around the office and procured the other views of other people in the office, correct? Isn't that the record that she actually went to see who, and if a person turned out to be an advocate, whatever that means, then that would mean no ad, notwithstanding what it said. Well, I think that the testimony was that there had to be a determination made to avoid all of the issues that I think Judge Niemeyer had indicated, and one of those is trying to avoid controversy. You know, how do you avoid controversy by deciding who's saying it? That is the ultimate of contrary to the American way. You're saying that if John Doe, who I liked, is saying this message, okay, but if I find that or whomever, let's say somebody else or Betty X or whoever says it, same thing, but I find out after looking at her webpage that she's a person, a persona non grata or whatever, or maybe a lightning rod, then they don't get the ad? That sweep is exactly what the case law says. The law lacks any plainly legitimate sweep. That's the other side of facial ineffectiveness beyond just whether or not any particular circumstance could be relevant. Isn't that the two sides? Isn't this sweep incredible? We go and find out. We do a search on you. We do a search to see whether or not your ad is permitted. What could be brought in terms of viewpoint discrimination in that? Well, Your Honor, I would note that under Lehman, the Supreme Court in that case specifically indicated that the pamphlet here would be prohibited as well and that they endorsed the concept that buses wanted to endorse. They wanted to endorse not just the narrow advertising by identified political candidates, but any issue-based advocacy. I don't know how you determine whether something is an issue-based advocacy without trying to determine that. Other than it said that they had 26 years, they had never accepted any, and that's any, political or public issue advertising on these vehicles. It's amazing how people take cases and then extend them way beyond the facts. That's what drove the facts here in this case. But here, this case here, on its record, it says that you went beyond just whether it was political. You determined based on who is speaking, gave information as to whether or not it's permitted. What could be brought in there? Well, Your Honor, I think that that, again, that discussion was had in the context of presenting hypotheticals during the depositions in which... Well, I think... Go ahead, Judge Niemeyer. Go ahead. Go ahead, Judge Niemeyer. Yeah. I thought the testimony was that in order to determine whether speech was controversial, whether it was political as a public debate on it, she checked to see whether it was a political action committee and it wasn't because they were political action, but that was intended to be evidence of a political message. In other words, she was trying to find out if this is part of public debate that has another side to it and could be controversial. I'm not... That's what I thought the record showed in this case, but I may be wrong on that. I agree with that. I think that's a fair characterization of what was said. So you mean, so the inquiry was to see whether or not someone disagreed with it? Well, the first step in the process is that the advertisements have to be submitted. And there was lengthy discussion at depositions about hypothetical ads, none of which had ever been submitted, many of them which had never been submitted. The discussion was being done in the vacuum of the high pressure of the deposition without the discussion and back and forth that potentially would have been had with respect to any of the ads. And so, while I with respect to these types of decisions and these types of forum, that it has to not be arbitrary, capricious, or invidious. There's certainly no evidence that that occurred with respect to the plaintiff's ad. And if discretion means anything, I think it has to allow the authority to make close calls. And, you know, obviously there may be some situations in which that close call would be resolved in a way that this court may not agree with or others. Listen here, what about this? Is it true that the record says that it was proposed that perhaps if they partner with another group, a message could be given, correct? I believe the specific testimony was is that if they partnered with a governmental, it could be considered a public service message. And let me just note on that. Governmental? I mean, wasn't another group detecting animals? Was that governmental? My recollection of the testimony, your honor, is that the specific context of that question was if they had partnered with a governmental organization, that it could be considered as a issue of public advocacy type of ad in the context of a governmental. And I would note government speech. Government speech is not subject to a First Amendment scrutiny. That's correct, your honor. And I mean, if they partnered with the government, that's, oh, my goodness, they're saying that, okay, you can speak as long as you get the government to join you. Well, goodness, that's the most antithetical statement I can think of American way in terms of our Constitution. Your honor, I appreciate the point, but I would note, as Judge Niemeyer indicated, that in fact... I'm not debating with Judge Niemeyer. I'm talking about talking to you. You're saying that that represents the First Amendment analysis to say, oh, you can do this if you get the government to agree. I know a lot of authoritarian, totalitarian governments around the world might be embracing our Constitution if it was read to mean that. Your honor, I would note that assuming that GRTC is a governmental actor, and of course, we don't concede that that's an issue in this case. However, if that were the case, government speech is not covered by the First Amendment. Government can run its own speech and government can prefer its own speech. That's not the point. The point is we're trying to interpret your advertising, and it's not whether or not we know the government is different, but you say in part of the way you do this, you told them perhaps if you join, this is your words, with the government, a government entity, you could put the same thing on there or what? Would they have to alter it or what? Again, your honor, I think the discussion was, the context was, if you work with a governmental agency or entity, perhaps we would consider running it as something that would constitute essentially a government speech advocacy on their behalf, and that's permissible. That's permissible. The government can prefer its own speech. So you don't think that that would be the law in a plain or legitimate suite there? You think that's a legitimate suite to say, well, we can call you out if you don't have the government's imprimatur, and if you do have it, you can have an ad? I think that the question is whether or not there are delineable standards, and if you're asking me whether or not that is a delineable standard, I would say that it is. If the question is, you partner with a government agency to advocate on behalf of an action or activity that you work with that agency on, that's going to be allowed, whereas if it's something that's controversial or political, you can't do it on your own. That is a delineable, clear standard that satisfies the non-public forum requirements of Lehman and all of the cases that have been discussed. I thought they didn't want any controversy. So you're telling me that there's no controversy when the government joins your view? I think a lot of views of the government, that's what sparked, that's what changed a lot of those things. I mean, we had in terms of enslavement of people and all kinds of atrocities in our countries because people spoke up against government practice, and that's how we got to eventually change. But you're saying that that's a proper First Amendment sweep to say that if you can encourage the government to join you, then that's the way it operated? That's far from Lehman. Far from Lehman. I respectfully disagree, Your Honor. I understand that you may respectfully disagree, but in reading the case, you're nowhere near that. It's because they had been true to the sense of all of them. It's no question they could ban every political act. Period. That's what Lehman stands for. You could. But you can't just take it and say, well, viewpoint here, and we do that, and we'll decide that, because there's no way, as a district court found, any reasonable person would understand what the restriction is. Again, Your Honor, I don't think that that's what happened here. And the evidence being presented as hypotheticals, the vast majority of those are not real world examples of ads that were ever presented and vetted and discussed. And it was an offhanded comment that was made during the deposition, and whether or not what practical effect it would have, it's hard to tell without you know, working the process from beginning to end. I think that the larger point is that government speech is government speech, and it's simply not, the First Amendment doesn't apply to government speech in this context. And so it's in some ways, I think, I mean, I would argue a red herring to try to delineate that out from the larger issues that are going on. So on that, Judge, I see I'm way, way, way beyond my time, and I certainly appreciate it, and I appreciate seeing Mr. Strugar again. All right. Mr. Strugar, you have some time reserved. Three points, if I may, Your Honors. First, on the government speech issue, it was never raised below, and GRTC has waived it, presumably because GRTC does not believe it is part of the government. It's also not how the doctrine works. When GRTC runs an ad for McDonald's, it's not Richmond or GRTC telling people, yay McDonald's. It's an advertisement. Finding government speech in an advertising forum would destroy the doctrine. But you know, I think what you say is pretty, pretty true, but we try to figure out where the jurisprudence is on this, and we have the Walker case where an individual designs his own license plate, it's his own speech, and the government approves it and puts it on the license plate, and the Supreme Court says that's government speech. Sure. That's because the whole forum is a government speech forum. This came up in the argument. It's on the license plate, and it's for display. Everybody knows it's a government license plate, but it's got the individual who's driving the vehicle's speech. And so here we have a government bus, but the advertisement had to be approved by the government. Clearly, it's private speech because it's an ad that people assume. They're not perfectly analogous, but I must say these things aren't all crystal clear. Sure. I think in some ways you're conflating two parts of the license plate. In Walker, they weren't dealing with the actual numbers on the plate that are the individual drivers or licensees' speech. They were dealing with the background, the frame, how that all works, and they said that was the government speaking. This came up a good bit in one of the Third Circuit cases recently, an argument. Judge Hardiman made the point that in all the government speech cases, those forums were never open. So if you have a forum that sometimes the government can say, oh, now it's us speaking, but other times, hey, it's just private individuals speaking, and the viewer doesn't know whether it's on or off, that would destroy the doctrine. Because at that point, the government could just allow in stuff that it likes. Progressives could rally in Monroe Park because the city of Richmond is progressive, but prevent the Tea Party from rallying there. Yeah, but the government's explained that that's the difference between a non-public forum and a public forum. In the non-public forum, the government can exclude and does exclude as long as it's not arbitrary, capricious, and invidious. So it's a different standard altogether when we're talking about putting ads on the side of a public bus. Now, I know whether it's a public bus is another issue, it seems to me. In government speech doctrine, there's no forum at all. It's not that it's not a public forum. There's just no forum. Here, we have a non-public forum that's been conceded by all parties. So if I could just get back to Lehman for one moment, I know I'm over my time, but again, Lehman dealt with a precisely defined prohibition that if we had here, white coats ad could have come in. GRTC interprets political to mean anything that deviates from the status quo, and that was the problem with Mansky, and that's the problem with post-circuit Mansky circuit cases. And that's how the circuits reconcile Lehman and Mansky, especially Center for Investigative Reporting in the Third Circuit and the Zuckerman case out of the DC circuit. They said basically, if you have a narrowly defined and understood definition of what political means, that can be implemented in a non-public forum, but these indeterminate prohibitions cannot. Second, as to the arbitrary capricious and invidious, I mean, Lehman just applies a Lehman predated public forum analysis, which was developed in the 80s. It's a case from 1975. The modern test for reasonableness, which Mansky defines, is whether it's guided by objective and workable standards. Lehman has a much lower bar for state factors to clear the invidiousness, capriciousness, and arbitrariness standard is just much easier for government than the modern test in non-public forums. So for those reasons, we asked the court from the district court on the state action and as applied rulings, and to reverse the district court on the facial validity of the statute. Thank you. Mr. Hill, Mr. Struger, thank you so much for this engagement. Let you know that the court appreciates your robust arguments and thank you so much. And we can't come down and shake your hands, but know that we appreciate your arguments and well done on both sides. Thank you so much and be safe and stay well. Thank you, Your Honor. Yes, indeed. And with that, we'll ask the deputy to adjourn the court, at least for this session. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: Roger L. Gregory, Paul V. Niemeyer, Julius N. Richardson